IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TALON RESEARCH, LLC,

    Plaintiff,

v.

TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC., TOSHIBA CORPORATION,

    Defendants.

No. C 11-04819 WHA

**ORDER GRANTING MOTION TO DISQUALIFY COUNSEL**

## INTRODUCTION

In this patent-infringement action, defendants move to disqualify plaintiff's counsel, Feinberg Day Alberti & Thompson LLP, pursuant to California Rule of Professional Conduct 3-310(E). For the reasons stated below, the motion is **GRANTED**.

## STATEMENT

Plaintiff Talon Research, LLC is a small Delaware non-practicing entity. In September 2011, plaintiff acquired United States Patent No. 5,581,498 and United States Patent No. 6,799,246. Plaintiff then sued, alleging infringement of these patents against defendants Toshiba America Electric Components, Inc., Toshiba America, Inc., and Toshiba Corporation. Talon alleges direct and indirect infringement. Several of Toshiba's "e-MMC series" and "microSD" products are accused. (Lim Decl. Exh. A at 3–4). Pursuant to a joint stipulation by the parties, plaintiff voluntarily dismissed all claims against Toshiba America, Inc.

The remaining defendants (hereinafter "Toshiba") subsequently filed an answer denying infringement and counterclaimed for declaratory judgment of non-infringement and invalidity (Dkt. Nos. 20–21).

Six of Feinberg Day's seven attorneys formerly worked for DLA Piper: M. Elizabeth Day, David Alberti, Marc Belloli, Clayton Thompson, Sal Lim, and Yakov Zolotorev. All six of the former DLA Piper attorneys were involved in representing Toshiba in intellectual property matters. These six attorneys collectively billed 3,882 hours for their work on those proceedings (Hwangbo Decl. ¶¶ 3, 8).

Attorneys Day, Alberti, and Belloli are named as counsel on plaintiff's complaint (*id.* ¶¶ 2–8). Defendants move to disqualify Feinberg Day from representing plaintiff in this action in light of the conflict (Hwangbo Decl. ¶ 2). This order follows full briefing and hearing.

**ANALYSIS**

**1.  LEGAL STANDARD.**

Pursuant to Local Rule 11-4(a)(1), every attorney before this district court must "comply with the standards of professional conduct required of the members of the State Bar of California." Accordingly, California law governs the issue of disqualification. Here, the relevant standard is set forth in the California Rule of Professional Conduct 3-310(E):

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

Because of the potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny. *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1049 (9th Cir. 1985).

Our court of appeals has interpreted Rule 3-310(E) to require that "the former representation [be] 'substantially related' to the current representation." Whether a substantial relationship exists is determined by reference to: (1) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation and (2) the relationship between the legal problem involved in the former representation and the

legal problem involved in the current representation. Where the party seeking disqualification demonstrates the requisite substantial relationship, "access to confidential information by the attorney in the course of the first representation is presumed and disqualification is mandatory." *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 706–09 (2003). Once an attorney is disqualified, there is a presumption of vicarious disqualification of the entire law firm, rebuttable only by evidence that the law firm "adequately screened the attorney from others at the firm." *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 784 (2010).

### 2. NATURE AND EXTENT OF FEINBERG DAY ATTORNEYS' PRIOR REPRESENTATION OF TOSHIBA.

Courts must "differentiate between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose related solely to legal questions." A court should examine the time spent by the attorney on the earlier case, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy. *Morrison*, 69 Cal. App. 4th at 234.

Attorneys Day, Alberti, Berlloli, Thompson, Lim and Zolotorev were involved in representing Toshiba in seven prior proceedings by or against Hynix Semiconductor, Inc. Three of these matters were before the ITC: (1) *In re Certain Flash Memory Devices and Components Thereof, and Products Containing Such Devices and Components*, U.S. I.T.C. Inv. No. 337-TA-552 (2005); (2) *In re Certain NAND Flash Memory Devices and Products Containing Same*, U.S. I.T.C. Inv. No. 337-TA-553 (2005); and (3) *In re Certain NAND Flash Memory Devices and Components Thereof, and Products Containing Same*, U.S. I.T.C. Inv. No. 337-TA-592 (2007). The remaining four proceedings were in this district: (1) *Toshiba Corp. v. Hynix Semiconductor Inc.*, No. 05-CV-02914 VRW; (2) *Toshiba Corp. v. Hynix Semiconductor Inc.*, No. 05-CV-04016 VRW; (3) *Hynix Semiconductor Inc. v. Toshiba Corp.*, No. 04-CV-04708 VRW; and (4) *Toshiba Corp. v. Hynix Semiconductor Inc.*, No. 05-CV-04547 VRW. The district court actions commenced in July 2005 and continued until 2007. The first action was dismissed without prejudice. Each of the subsequent proceedings was dismissed by agreement of the parties. Thorough review of the supplied records reveals that Attorneys

1  Zolotorev, Thompson and Day each had a direct and personal involvement in the Hynix
2  proceedings.
3       Attorney Thompson billed over 2,000 hours to Toshiba for his work on the ITC
4  and district court actions between 2005 and 2007. Attorney Zolotorev billed over 1,500.
5  Both contributed to trial preparation and attended the hearing before the ITC in the 553 action.
6  Their work included many preparing Toshiba's witnesses (Park Decl. Exh. B ("Billing
7  Records")). Attorney Thompson was specifically involved in responding to issues related to
8  Toshiba's relationship with SanDisk. In 2006, Attorney Thompson prepared for and conducted
9  an inspection of Toshiba's Yokkaichi plant. He also participated in a teleconference with
10 Toshiba related to substantive positions and defense strategy, and was responsible for
11 drafting interrogatory responses related to the domestic industry (*id*. at 50, 64, 68–70).
12 Attorney Zolotorev similarly participated in case strategy conferences. Attorney Zolotorev
13 traveled to Japan and conducted a five-day, on-site inspection of Toshiba's fabrication facility.
14 He made a second trip to Yokkaichi to supervise document collection at the facility for four
15 days. Attorney Zolotorev also defended depositions on Toshiba's behalf, and conducted
16 depositions of expert witnesses. In addition, Attorney Zolotorev was also responsible for
17 redacting confidential information from at least one filing (*id*. at 48–50, 62–64, 72).
18      Neither Attorneys Thompson nor Zolotorev contests the depth of their involvement
19 in the Hynix proceedings, except to state that their work was focused entirely on the
20 "technical aspects" of those representations (Zolotorev Decl. ¶ 6; Thompson Decl. ¶ 6).
21 Attorney Thompson's electrical engineering background was similarly raised at the hearing.
22 Simply because these attorneys brought technical skills to their legal representation does not
23 change that it was, in fact, legal representation.
24      Attorney Day billed approximately 150 hours for her work on the Hynix proceedings.
25 Although this was fewer hours than Attorneys Thompson or Zolotorev, her participation was
26 similarly direct and personal. Attorney Day was counsel of record in two of the district court
27 actions. During the ITC proceedings, Attorney Day participated in intra-office conferences
28 regarding Toshiba's strategy. Attorney Day attended the case management conference and was

responsible for a significant amount of document discovery. Attorney Day also prepared for and defended the deposition of Seiji Miyata (Billing Records 27–30, 35–40, 46). Mr. Miyata was *and remains* the Chief Specialist at the Flash Business Strategy Development Department of Toshiba's Semiconductor Company. Mr. Miyata was and continues to be responsible for developing business strategies for NAND flash memory products (Miyata Decl. ¶ 4).

In light of the billing records, Attorney Day's participation cannot accurately be described as "on the periphery for a limited and specific purpose related solely to legal questions." Attorney Day's assertions that she does not recall "conversations with Toshiba regarding document collection," or advising any Toshiba representative regarding settlement strategy do not cure the direct nature of her prior representation (Day Decl. ¶¶ 3–4). That the deposition of Mr. Miyata lasted "less than three and a half hours" is similarly inapposite. Defendants have met their burden to illustrate a direct and personal prior representation; they need not divulge what specific confidences were shared in the course of that representation.

At the hearing, Feinberg Day stated that its attorneys never had access to confidential information, because they "didn't know what Hynix didn't know." This order disagrees. Attorneys Thompson, Zolotorev, and Day had access to Toshiba's management and personnel on a confidential basis. This is sufficient to refute the point. More than that, the proceedings had protective orders regarding the "disclosure of trade secrets or confidential research, development, or commercial information" (See *e.g.*, No. 05-cv-0478 Dkt. No. 61 at 2) (emphasis added). Under these orders, Hynix could not use the documents discovered in prior proceedings in any other litigation. Furthermore, several documents were filed under seal. Thus, what Hynix "knew" about Toshiba's confidential information in the prior proceedings was both limited and protected, not stripped of its confidential nature as Feinberg Day suggests.

This order finds that Attorneys Day, Thompson and Zolotorev each directly and personally represented Toshiba in prior proceedings. Defendants further argue that Attorneys Alberti, Berlloli, and Lim also directly represented Toshiba in the past. Because this order has already found that three Feinberg Day attorneys were directly and personally involved in the

Hynix proceedings, vicarious disqualification will extend to the entire firm upon a finding of a relationship between the past and current representations.

### 3. SIMILARITY BETWEEN THE SUCCESSIVE REPRESENTATIONS.

A substantial relationship exists between past and current representations where the "subjects are linked in some rational manner." What constitutes the "subject" of litigation is broader than the discrete legal and factual issues involved:

> Successive representations will be substantially related when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues.

*Jessen*, 111 Cal. App. 4th at 713. Confidential information may include the identity of key decision makers, litigation philosophy, and organizational structure of the former client. Reason, logic, and common sense should be exercised in applying the substantial-relationship test. *Ibid.*

The parties agree that neither the Federal Circuit nor our court of appeals has specifically ruled on application of the 3-310(E) substantial-relationship test in successive patent actions. While the undersigned has ruled on disqualification in prior patent actions, none of those orders expressly addressed "substantial similarity." In only a handful of courts in this district have counsel raised the issue. None of these decisions has required literal identity of patents under the substantial-relationship test. In *Openwave v. 724 Solutions*, the district court declined to adopt the "untenable standard that the patents involved be identical or essentially the same." Nothing about representation in patent litigation requires a special standard. Instead, the analysis turns on whether "it is reasonable to assume that confidential information material to the present action would normally have been imparted to [the attorneys] in the course of [prior] representation." *Openwave Sys.*, *Inc*., 2010 WL 1687825 at *2, (N.D. Cal. Apr. 22, 2010) (Seeborg, J.).

In *Hewlett-Packard v. Nu-Kote International*, the district court found no substantial relationship of subject matter where the prior representation involved toner refill and inkjet refill

6

cartridges and the later representation related to laser printing cartridges. The *Hewlett-Packard* court noted that "the PTO considers laser printing and inkjet printing so dissimilar from one another that it places them in separate categories in its classification system." The court further stated:

> This differentiation indicates that the two technologies are not closely related. The PTO's decision to classify the technology separately justifies a finding that [the law firm]'s prior work for Nu–Kote is not substantially related to [its] present representation of HP. The PTO's decision to classify products is very important in analyzing a motion to disqualify.

*Hewlett-Packard Co. v. Nu-Kote Intern., Inc.*, No. C–94–20647, 1995 WL 110558 at *5 (N.D. Cal. Mar. 8, 1995) (Aguilar, J.).

The parties disagree on how to define the "subjects" of the prior and instant litigation. Defendants argue that the representations are substantially the same because both involve "NAND flash memory technology and products" (Hwangbo Decl. ¶ 4). Plaintiff argues that the prior representation was "without exception focused on the fabrication and design of circuitry closely tied to memory cells and was internal to the memory devices," which have no relationship to the patents asserted in the present action.

Flash devices are a type of electronically-erasable programmable read-only memory chip. These devices are often incorporated into memory cards, like those used in computers, video game consoles, and other digital devices. In the Hynix proceedings, Toshiba and Hynix alleged infringement of each other's NAND flash products (Hwangbo Decl. ¶ 4). Those products included flash memory cards manufactured and/or sold by both parties. Hynix specifically accused several of Toshiba's SD, "microSD" and "MMC" memory cards (Park Decl. Exh. K). The several patents asserted in those actions described circuitry for semiconductor chips used in flash memory devices (Azar Decl. Exhs. C–J).

The two patents asserted herein also relate to flash technology. *First*, the '498 patent, entitled "Stack of IC Chips in Lieu of a Single IC Chip," describes "positioning multiple memory die within a module (or chip package)." A separate interface chip is included in the invention. This chip translates requests from outside the chip package to requests directed to one or more of the separate memories. The stack of chips are treated as a "single functional unit,

7

rather than a collection of separate and distinct memory chips" (Opp. 4; Lim Decl. App. A-1 at 1–4).

*Second*, the claims of the '246 patent, entitled "Memory Interface for Reading/Writing Data from/to a Memory" are directed to "a memory interface element that is placed between a bus and any number of memory devices." The interface element buffers requests from a host and passes data onto one or more of the memory devices. The '246 patent does not read on the operation of the memory chips themselves (Opp. 4–5; Lim Decl. App. A-3 at 1–5).

The patents asserted herein share more than merely the same "general field of technology" with those asserted in the Hynix proceedings. The '498 patent shares at least a PTO class and, in some cases, a sub-class with patents asserted in the Hynix proceedings. The '498 patent is classified as 365/63. The 365 classification refers to "static information storage and retrieval." Several of the patents asserted in the Hynix proceedings are also designated by this classification. The 63 sub-classification refers to "interconnection arrangements," defined as "subject matter having physical paths by which information is transferred to, from, or between storage elements." This sub-classification is shared by United States Patent No. 6,424,588, asserted in the Hynix proceedings. *See Toshiba Corp.*, No. 5-CV-04547 (VRW). Defendants argue that the degree of overlap in classification supports a finding of substantial similarity of subject matter. This order agrees. While the PTO classification system is not dispositive, common sense dictates that similar classifications weigh in favor of similarity.

Plaintiff argues that, because the '246 and '498 patents do not describe the internal circuitry of memory chips, they constitute different subject matter than those asserted in the prior actions. According to plaintiff, the fact that "none of the patents at issue in the prior representation of Toshiba was even cited in the prosecution of either of the patents at issue here," and vice versa, "confirm[s] that the relationship between the current and prior representations is not substantial" (Opp. 3). Plaintiff provides no authority for its proposed citation requirement or even approval of such a requirement by any court. This argument is merely splitting hairs.

8

Moreover, there is overlap of the products accused herein and those accused in the Hynix proceedings. All related to Toshiba's NAND flash products. Toshiba's "e-MCC" and "microSD" product series are specifically accused herein (Lim Decl. App. A-2 at 8). Plaintiff's first discovery request defines a broader class of accused products in this action, including "*any* Toshiba product that (1) comprises or includes stacked die and/or multi-chip package memory technology, and/or is MMC *or* eMMC compliant. . . " (Azar Decl. Exh. 1, exhibit N ¶ 8) (emphasis added). Toshiba's "microSD" memory cards were similarly accused in the Hynix proceedings (*id*. at exhibit C). Confidential information the Feinberg Day attorneys may have received about Toshiba's microSD product line would certainly be relevant to the present proceeding. Moreover, highly confidential information on defendant Toshiba's investment in NAND flash testing were among the documents filed in prior proceedings (Azar Decl. Exh. I). This is more than mere similarity. There is a literal overlap in the types of products plaintiff, itself, put at issue.

Plaintiff argues only that Toshiba has not shown the products at issue in the Hynix proceedings are "still available in the marketplace." This argument is unpersuasive, however, because of plaintiff's own actions thus far: it did not distinguish between products currently for sale and products Toshiba sold in the past in its discovery request (Azar Decl. Exh. 1, exhibit N ¶ 8). Even if the products accused herein constituted new models of the products accused in the past, a literal matching is not the appropriate analysis. Imposing such a requirement would emasculate Rule 3-310(E).

Plaintiff's own discovery request weighs in favor of finding the subjects substantially related. Plaintiff seeks documents regarding Toshiba's corporate structure and relationships "within each division, subsidiary, joint venture, or other Toshiba entity that designs, develops, markets or sells any Toshiba accused products." Plaintiff also requests documents "sufficient to show the organization of [Toshiba]'s manufacturing, fabrication, assembly, and packaging divisions," as well as the "organization of [Toshiba]'s distribution, marketing, sales, licensing, export and import divisions." Plaintiff additionally seeks information on Toshiba's relationship to SanDisk with respect to the accused products "*and/or* the sale of stacked die memory

9

products, multi-chip package memory products, MMC and/or eMMC compliant products . . ." (Azar Decl. Exh. 1, exhibit N). Information regarding Toshiba's structure and manufacturing, as well as its relationship with SanDisk, were directly at issue in the Hynix proceedings. Knowledge of Toshiba's tolerance for litigation, approach to patent litigation, as well as pressure points within its chain of command would enable counsel to here induce a favorable settlement.

In its prior representation, Feinberg Day attorneys were privy to the identities of key decision makers at Toshiba with respect to its NAND flash technology products. Counsel have important insight into the risk aversion (or not) of their former client and are now in a position to capitalize on that insight. There appears to be overlap even among likely witnesses. Even if Feinberg Day performed a collective memory lobotomy, Toshiba would rightly fear adverse use of information it shared in confidence. Toshiba may not be taken hostage by its former attorneys.

Finally, plaintiff argues that there is no substantial relationship because the Hynix proceedings constituted "competitor-on-competitor" patent litigation whereas the instant litigation "pits Toshiba against a one-man company that has no employees, makes no products, and whose only assets are twenty-three patents acquired in September 2011." Plaintiff argues that the limitation on remedies available to an NPE like Talon renders any prior licensing or litigation strategy disclosures by Toshiba immaterial. Yet plaintiff provides no authority for this special rule. At the hearing, plaintiff further represented that all companies have the same litigation strategy against NPEs: "pay as little and as late as possible." Litigation strategy cannot be so narrowly defined. The sad fact is that a former client in numerous cases finds itself being sued by its former lawyer on a substantially related matter. The former client has every right to expect that professional standards will be honored regardless of whether the new lawsuit is brought on behalf of a competitor or not. Accordingly, this order finds that the subjects of the prior actions and the instant litigation are substantially linked.

Information material to the Hynix proceedings is also material in the present action. This order finds that the second prong of the substantial-relationship test has been satisfied. Contrary to plaintiff's characterization at the hearing, this finding does not amount to a "lifetime

10

ban" on adverse representation. Where the subjects are dissimilar, or the prior representation so far in the past, the analysis may cut against disqualification. No such mitigating distance is present here.

**CONCLUSION**

In the Court's mind, this is not a close call and Feinberg Day should have known better than to sue its recent client on a matter so similar to those on which the client had recently opened its confidences to counsel. The public has a right to expect fidelity to professional standards. Feinberg Day has crossed the line here. Defendants' motion to dismiss is **GRANTED**.

Plaintiff is hereby ordered to obtain successor counsel who are to file a notice of appearance within **35 CALENDAR DAYS** of this order. Absent a written appearance by successor counsel within the time specified, an order to show cause why this action should not be dismissed will issue.

Feinberg Day Alberti & Thompson LLP is hereby ordered to phase itself out promptly and to facilitate the substitution of new counsel.

**IT IS SO ORDERED.**

Dated: February 23, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE